FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2014 MAY 20 P 1:33

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

EARL LEE )
73 Carriage Hill Drive )
Fredericksburg, Virginia 22405 )
)
Plaintiff, )
)
v. ) Case No. 1:14CV581
) JCC/TCB
COMPUTER SCIENCES CORPORATION )
3170 Fairview Park Drive )
Falls Church, VA 22042 )
)
Serve: CT Corporation System )
    4701 Cox Road, Suite 285 )
    Glen Allen VA, 23060 )
)
Defendant. )
)
)

### CIVIL COMPLAINT FOR EQUITABLE
### AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL

#### Introduction

1. Computer Science Corporation ("CSC") fired Earl Lee ("Lee") on April 9, 2013 (1) because he supplied information to his employer that could prompt an investigation under the FCA, in violation of the anti-retaliation provision of the False Claims Act (FCA), 31 U.S.C. §§ 3730(h); (2) because of his race, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §2000e, et seq.; and (3) because Lee complained about employees making racial insults and slurs, in violation of Title VII.

1

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, the False Claims Act, 31 U.S.C. § 3730(h), and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §2000e, *et seq.*

3. On October 7, 2013 Lee filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against CSC for racial discrimination and retaliatory employment termination. After investigating the complaint, EEOC closed the file after being unable to conclude that any statute had been violated and provided Lee with notice of his right to file a lawsuit under federal law in United States District Court.

4. Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 because it is the judicial district where the unlawful employment practices are alleged to have been committed, and CSC may be found in this District.

## PARTIES

5. Plaintiff Earl Lee resides at 73 Carriage Hill Drive, Fredericksburg, Virginia 22405. He was employed at CSC since July 2011.

6. Defendant CSC is Lee's employer and a contractor for the United States Department of Defense. CSC is headquartered at 3170 Fairview Park Drive, Falls Church, VA 22042. CSC is incorporated under the laws of Nevada.

## FACTUAL ALLEGATIONS

7. In July 2011, Lee was employed by CSC.

8. In August 2012, Lee was assigned as Senior Logistician in Afghanistan for the VOSS project.

9. CSC is a contractor, with approximately 87,000 employees that is frequently employed by the U.S. Department of Defense to provide technology services.

10. In August 2012, Lee was deployed to Afghanistan to work on the VOSS project.

11. Luis Mercado was the Regional Support Center (RSC) Site Lead and Lee's direct supervisor in Afghanistan.

12. Lee worked side by side with a team consisting of about three CSC employees and five Lockheed Martin employees.

13. CSC is the prime contractor for the VOSS project and Lockheed Martin ("LM") was the subcontractor.

14. In September 2012, Mercado counseled Lee and told him to implement policies and standard operating procedures for accountability.

15. In September 2012, Lee told Mercado that he is a Minister of the Gospel and stated that he would come in early each day to make up for time spent in church on Sundays.

16. Mercado agreed that Lee could come in early each day to make up for time spent at church.

17. Beginning in October 2012, Lee observed difficulties with employees from both CSC and LM.

18. In October 2012, Lee complained to Mercado about LM employees for lack of teamwork and poor job performance.

19. In October 2012, at Mercado's direction, Lee held a meeting with CSC and LM employees to discuss duties, responsibilities and accountability.

20. Mercado provided Lee with a description of each employee's responsibilities and a form to have each employee sign to acknowledge the meeting and training.

21. The LM employees refused to sign the form stating that they refused to take direction from anyone other than a LM project manager.

22. Lee reported to Mercado that the LM employees refused to sign the form, and suggested that Mercado hold a meeting to explain the chain of command.

23. Mercado agreed to the meeting with Lee in attendance.

24. During the meeting, Adam Powell, a LM technician, wadded up the form, threw it at Mercado, and declared, "I don't want to take orders from Earl."

25. Mercado reported the performance problems with the LM employees to Operations Manager, Neville Reid.

26. Also in October 2012, Lee complained to Reid and Mercado that LM employees were suffering time management problems, including LM employees' refusal to work the regular 12 hour a day and leaving work early.

27. Lee also complained about cannibalization of equipment because LM technicians were removing parts from damaged equipment and using them for replacement parts instead of requesting new parts.

28. On or about October 2012, CSC management brought in CSC technician Darryl Morris as Site VOSS Lead.

29. Around mid-November 2012, Lee and Mercado began receiving complaints from the government and the crew manager about LM technicians Powell and Dan Turner.

30. Soldiers complained that Powell and Turner were never on site to work on equipment and were not reachable.

31. Mercado ordered Turner and Powell to return to FOB Sharana.

32. On November 22, 2012, Mercado held a teleconference with Lee, Morris, Powell, Turner, and Reid to discuss the complaints.

33. During the teleconference, either Powell or Turner said to Morris and Mercado, "fuck the white man" and made threats about getting Morris fired.

34. Morris is white.

35. During the teleconference, Lee told Powell, Turner, and LM technician McKenzie St. Lot that they should relax and conduct themselves in a professional manner.

36. Powell and other employees became upset with Lee and stated that because Lee goes to church, Lee felt superior to others.

37. Powell and other employees also called Lee a hypocrite because Lee listens to jazz and stated that Lee was an "Uncle Tom" or "white man lover."

38. Powell and other employees stated that Lee was not black because he had a different hair texture.

39. Several slurs were made behind Lee's back and relayed to him by others, including CSC logistician Leonard Bolanos and Vista Employee Kirmage Muhajir.

40. Powell and others also wrote disparaging comments about Lee on a white board.

41. Lee has a black complexion, but because of his adoption, his ancestry is unclear.

42. Powell, Turner, McKenzie, and Wade are black.

43. Lee immediately reported the race based insults to Mercado.

44. Mercado stated that he would talk to the LM employees about the racial slurs and insults.

45. In late November and early December 2012, Morris went on R&R.

46. As Morris suggested, Lee agreed to fill in for Morris as Acting VOSS Site Lead.

47. Morris informed Mercado that Lee was filling in for him as Acting VOSS Site Lead.

48. Under Lee's supervision, during the month of December 2012, the VOSS project operated smoothly and all employees were productive.

49. Around the first week of January 2013, Mercado told Lee that he wanted him to convert from Acting VOSS Site Lead to VOSS Site Lead.

50. On January 10, 2013, Mercado sent out an email to management and employees that Lee was the New Site Lead.

51. Lee assumed the role of Site Lead on January 11, 2013.

52. Operations Manager Reid told Lee that they were setting up full operations in Ghazni, Afghanistan, and that they would need technicians to travel back and forth to repair equipment until FOB Sharana closed.

53. Lee told Powell and Turner that they would rotate between Ghazni and Sharana because of their experience.

54. Lee told Powell and Turner that they would have to report to him or personnel in the field at 7 am each day.

55. On or about January 22, Lee sent Powell to Ghazni for two weeks.

56. Powell refused to call each day as instructed and did not return from Ghanzni as instructed.

57. Turner also failed to return as Lee instructed.

58. On February 6, 2013, Lee contacted Reid and told him of these ongoing difficulties with LM employees.

59. Reid suggested to Lee that he counsel LM employees in writing and provided Lee was a CSC counseling form.

60. On February 7, 2013 Lee spoke with Reid again and reiterated the concerns he had with Powell and Turner.

61. On February 9, 2013 Chas Jones, the new Regional Support Center (RSC) Site Manager emailed Lee and stated that he was coming out to Sharana.

62. On February 10, 2013 Lee emailed Powell and again ordered him to return from Ghazni.

63. Also on February 10, 2013, Jones arrived and told Lee that Deputy Director Robert Schroeder had suspended Lee with pay and that Lee had 24 hours to vacate theater.

64. Lee immediately contacted Reid and Schroeder, about the suspension.

65. Reid and Schroeder denied knowing what the suspension pertained to.

66. Later Schroeder stated that he was told by corporate that there was a complaint against Lee for not being able to work with others and that Lee should contact the Corporate Office of Employee Relations.

67. Lee contacted government representative Desiree Townes, and told her about suspension and the events leading to the suspension.

68. On February 10 a Vista Information Technology Specialist named Krmange Muhajir emailed Employee Relations to complain about the problems with the LM employees.

69. In an effort to set the record straight, Muhajir complained that Turner and Wade were the troublemakers of the VOSS project.

70. Muhajir also stated in his complaint that all the LM employees think about is getting it "pure black" in the VOSS project and that Lee is not "pure black" but "mixed with Chinese."

71. Sometime after the suspension, McKenzie, Turner, Powell, and Wade were heard by Townes, Bolanos and Muhajir bragging about a complaint they wrote to get rid of the "Uncle Tom" "white man lover" and "snitch."

72. On February 11, at Lee's request, Lee received a copy of the suspension letter, dated February 8, 2013 which was signed by Schroeder.

73. The suspension letter stated that Lee was suspended for a possible violation of HRMP Conduct 2017; 4.1.1 for "inability and unwillingness to work harmoniously with others."

74. The suspension letter stated that CSC was starting an investigation and that Lee would be suspended without pay effective February 20, 2013.

75. Later on February 11, 2013, Lee emailed Slonaker and Greene, a Management Specialist at CSC, and asked for the purpose of the suspension.

76. On February 12, 2013 Schroeder emailed Lee and copied several others that Lee was never appointed as Site Lead.

77. Lee was forced to depart from Afghanistan on February 13, 2013.

78. In mid-February, several people provided statements to CSC defending Lee.

79. On February 21, 2013 Lee emailed Employee Relations to ask about the status of the investigation.

80. On March 21, 2013, Slonaker emailed Lee asking him questions about the work environment, whether or not he attended church services, whether he shared vehicles, whether he

made statements about the company needing to be black run, and who she should contact to complete the investigation.

81. Lee responded that he had an arrangement to attend church, and stated that Bolanos was the receipt holder for vehicles and that everyone had access to the vehicles at the worksite, that he made no statements about the company needing to be black run, and provided persons to contact as witnesses.

82. When Lee asked Slonaker whether the credibility of the complaining employees had been verified, Slonaker responded, "They are not in question, you are."

83. On April 9, 2013, Greene emailed Lee and stated that CSC had terminated his employment effective that day, because CSC's investigation confirmed the alleged, yet unstated, misconduct.

84. Shortly thereafter, Lee applied for unemployment.

85. On April 8, 2013, CSC told the Unemployment Commission that Lee was on approved leave pending an investigation and requested a telephone hearing.

86. The Unemployment Commission scheduled the hearing for April 23, 2013.

87. CSC argued that Lee had issues of racial discrimination, manipulative relations of other employees, misuse of company assets, and time care fraud.

88. Benefits were granted to Lee in light of CSC's failure to provide evidence of voluntary termination or alleged misconduct.

## COUNT I
**Retaliation in Violation of the False Claims Act, 31 U.S.C. 3730(h)**

89. Lee hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

90. CSC cannot retaliate against an employee who engages in protected conduct under the False Claims Act, 31 U.S.C. § 3730(h), by taking lawful actions in furtherance of an FCA action, including investigation for, testimony for, or assistance in an action filed under the FCA.

91. An employee has engaged in protected conduct when litigation under the False Claims Act is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when litigation is a reasonable possibility.

92. An employee need not actually file a *qui tam* suit or even known about the protections of section 3730(h) to qualify for protection under the retaliation provision.

93. An employee who supplies information that could prompt an investigation under the FCA engages in protected conduct under section 3730(h).

94. From October 2012 to February 6, 2013, Lee made complaints to Mercado and Reid, and shared complaints from employees, soldiers, and the government, about the employees working at the VOSS site that refused to perform work but were likely billing their work to the government.

95. Mercado and Reid were aware and corresponded with Lee about these complaints.

96. After learning of Lee's complaints and protected activities, CSC retaliated by suspending and terminating his employment.

97. Lee suffered damages as a result of CSC's unlawful conduct.

98. Lee demands such legal or equitable relief as will effectuate the purposes of the FCA, including, but not limited to economic damages, compensatory damages, punitive damages, reasonable attorney's fees, pre-judgment interest, court costs, and any other relief that this Court deems just and equitable.

## COUNT II
## Title VII Race Discrimination

99. Lee hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

100. Title VII prohibits an employer from "discharg[ing] any individual, or otherwise... discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C.A. § 2000e-2(a).

101. Employees in a protected class, including African American, are covered by Title VII.

102. Lee is African American.

103. Lee's job performance was never in question during his time at CSC until his suspension.

104. Lee was suspended without pay in February 2013 and ultimately terminated on April 9, 2013.

105. CSC's decision to terminate was based on a complaint from the same employees who Lee identified to management as poor performers and the makers of racist comments and slurs against him.

106. CSC relied on the complaint of employees who were known to management to hurl racist slurs and insults at Lee in the decision to terminate Lee's employment.

107. Lee suffered damages as a result of CSC's unlawful conduct.

108. Lee demands such legal or equitable relief as will effectuate the purposes of Title VII, including, but not limited to economic damages, front and back pay, compensatory

damages, punitive damages, reasonable attorney's fees, pre-judgment interest, court costs, and any other relief that this Court deems just and equitable.

## COUNT III
### Title VII Retaliation

109. Title VII prohibits retaliation against employees for engaging in protected conduct.

110. Utilizing informal grievance procedures as well as voicing one's opinions in order to bring attention to an employer's discriminatory activities is protected conduct.

111. Lee engaged in protected conduct when he complained in October 2012 and February 6, 2013 to Mercado and Reid about problem employees cursing management, including Lee and using racial insults and slurs.

112. Shortly thereafter, Lee was suspended without pay in February 2013 and terminated in April 9, 2013.

113. Lee was suspended and terminated for engaging in protected conduct.

114. Lee demands such legal or equitable relief as will effectuate the purposes of Title VII, including, but not limited to economic damages, front and back pay, compensatory damages, punitive damages, reasonable attorney's fees, pre-judgment interest, court costs, and any other relief that this Court deems just and equitable.

### **PRAYER FOR RELIEF**

Based on the foregoing retaliation and discrimination, Lee respectfully requests that he be awarded the following relief:

115. Reinstatement with the same seniority status, duties and working conditions applicable at the time of his termination, and abatement of the retaliatory conduct directed toward him, or alternatively, front pay;

116. Economic damages for lost wages and benefits, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination;

117. Compensatory (non-economic) damages, including damages for emotional distress and loss of reputation;

118. Non-economic damages for mental and emotional distress, embarrassment and humiliation, career damage, and harm to reputation;

119. Punitive damages to punish CSC for malicious acts of retaliation and to deter them from similar retaliatory conduct toward other employees;

120. Injunctive or equitable relief, as may be appropriate, to prevent further harm to others and the public caused by CSC's retaliation against a whistleblower;

121. Reasonable litigation costs, expert fees and reasonable attorney's fees, together with all other relief available from law and equity.

## JURY DEMAND

Lee demands a trial by jury for any and all issues proper to be so tried.

Respectfully submitted,

_____
Aaron Jefferson Cheatham, VA Bar No. 83152
Law Offices of J.D. Ngando, PLLC
4895 Prince William Parkway, Suite 202
Woodbridge, Virginia 22192
(703) 580-8088
(703) 656-4906 (facsimile)
*Counsel for Plaintiff*